2021 IL App (2d) 180554-U
No. 2-18-0554
Order filed May 5, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-2588 |
| DANIEL B. PEDERSON, | ) ) | Honorable Mark L. Levitt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justice Jorgensen concurred in the judgment.
Justice McLaren dissented.

**ORDER**

¶ 1   *Held*: Though the trial court's admonishments to the jury did not comply with Rule 431(b), the error was not plain error that would excuse defendant's forfeiture of the issue, as the evidence at trial on the charge of making a terrorist threat was not closely balanced.

¶ 2   After a jury trial, defendant, Daniel B. Pederson, was convicted of making a terrorist threat (720 ILCS 5/29D-20(a) (West 2014)) and sentenced to six years in prison. On appeal, he contends that the trial court committed plain error by failing to question prospective jurors in compliance with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The charge against defendant alleged that, on September 12, 2014, with the intent to intimidate or coerce a significant portion of a civilian population, he knowingly threatened to cause the commission of a terrorist act. Specifically, he placed a phone call to a government office stating that he would kill Gurnee police officers and "light up" the Gurnee police station and the Lake County courthouse in Waukegan.

¶ 5     At the start of jury selection, the trial judge provided the following admonishments to all the prospective jurors:

> "The first series of questions that [*sic*] I am going to ask you as a group. That means all of you in this room. Although I am going to ask you as a group, I want to you [*sic*] answer individually if you each understand and accept the following fundamental principles of our legal testimony [*sic*]. If you do, please indicate so by raising your hand.
>
> Do you each understand and accept that a person accused of a crime is presumed to be innocent of a charge against him? Record should reflect all raised their hands.
>
> Do each [*sic*] understand and accept that the presumption stays with the Defendant throughout the trial and is not overcome unless from all of the evidence you believe the State proved his guilt beyond a reasonable doubt? Record should reflect all raised their hands.
>
> Do you each understand and accept that the Defendant does not have to prove his innocence? Again, all raised their hands.
>
> And do you each understand and accept the Defendant is not have to [*sic*] present any evidence in his own behalf? Again, all raise [*sic*] their hands.

Do you understand that what that means the Defendant [*sic*] does not have to testify if he does not wish to? Again, all raised their hands.

And if he does not testify, do you understand that you must not consider that fact in any way arriving [*sic*] at your verdict? Again, all raised their hands.

And do you understand that if he does testify you should judge his testimony the same way you would any other witness? Again, all raised their hands.

Thank you."

¶ 6 At trial, the State's first witness, Ryan Bereczky, testified that he was defendant's long-time friend. In the past they had played hockey together and lived together in Gurnee in 2009 and 2010. Even when they no longer lived together, they continued to communicate monthly by both text and phone. On September 12, 2014, a Lake County sheriff's deputy visited Bereczky and asked him whether he recognized the phone number (815) xxx-xxxx. Bereczky told the deputy that he recognized the number as belonging to defendant. Indeed, Bereczky testified that, earlier that day, he had communicated with the defendant via text message at that number. The deputy played for Bereczky a recording of a call that was admitted at trial as People's exhibit No. 1. Bereczky told the deputy that he recognized the caller to be defendant. At trial, Bereczky also testified that he had listened to the recording again on the morning of his testimony, and confirmed the voice was that of defendant whom he also identified in open court.

¶ 7 The parties stipulated as follows. A child-support case against defendant existed in Lake County, Illinois. Defendant had an Illinois driver's license. On January 12, 2014, the Illinois Department of Health Care and Family Services (Department) caused the license to be suspended because defendant owed past-due child support. The suspension was still in effect on September 12, 2014. On September 12, 2014, defendant resided in southern California.

¶ 8     The State then called Brian Parsano.  On direct examination, he testified that, on September 12, 2014, he worked in the Department's customer-service call center in Springfield.  The center processed incoming calls only.  All calls were recorded.  Each caller was given an identifying number.  The center did not receive the caller's phone number.  Calls were routed to different lines depending on the subject matter, such as driver's licenses.

¶ 9     Parsano testified that, at 11:41 a.m. on September 12, 2014, he received a call. The State played People's exhibit No. 1, which Parsano identified as the call.  It lasted 37 seconds and went as follows:

> "[Parsano]: Good morning, thanks for calling the Child Support Customer Service Call Center.  This call is being recorded for quality assurance, my name is Brian, how can I assist you today in regards to your driver's license?
>
> [Caller]: Ah, I just want to let you guys know, I'm coming.  I'm fucking killing people. I'm killing the cops that arrested me.  You guys have no idea what's about to happen.  You guys fucking—
>
> [Parsano]: You do realize this call is being recorded?  Is there something I can assist you with?
>
> [Caller]: Come and get me.  Come and get me.  Come and get me.  Come and fucking get me.  I'm so—I'm lighting up the Gurnee Police Department and the Waukegan courthouse. Come and get me."

¶ 10    Parsano testified that, at this point, the caller hung up.  The caller never identified himself. Parsano kept the line open and reported the incident to his supervisor.  Later, he played the call for the sheriff's office and transmitted thereto a recording of the call.

¶ 11    Parsano testified that his question "You do realize this call is being recorded?" reflected his practice of trying to lower the emotional level of conversations with angry callers. He explained: "[M]ost people [who] call are not very happy in regards to the administrative process that is being taken. 90 percent of the time I can get the caller to recant what they had stated."

¶ 12    Parsano testified on cross-examination that, if the caller's phone recorded the call as lasting two minutes and six seconds, that duration could have included time preceding the conversation, when the caller was on hold or moving through the automated system. Parsano routinely tried to deescalate angry calls and had managed to deescalate some threatening calls. However, because defendant abruptly hung up, there was no chance to deescalate the situation or obtain a recantation.

¶ 13    Jeff Lowery testified on direct examination that, on September 12, 2014, he had been a deputy sheriff for 37 years and was the sergeant in charge of Lake County sheriff department's court security division. The division's offices were located on the courthouse campus. Lowery estimated that each day, at least 1000 people entered and exited the courthouse building. At about 11:55 a.m. on September 12, 2014, a worker from the Department called and told Lowery that he had received notice of a bomb being planted in the circuit clerk's office. Lowery had the clerk's office and the three floors above it evacuated and searched. After concluding that the area was "clear," Lowery allowed people back into the building. He had considered the threat as reported to be viable and not a prank.

¶ 14    Lowery testified that, after returning to his desk, he called the Department. A representative played a tape of the call and e-mailed a copy to Lowery. Lowery determined that the call did not make a bomb threat, but testified that, based on his experience in law enforcement, " 'lighting up' " is a common expression for "[s]hooting." Thus, after hearing the recording, he took further action. Lowery instantly heightened the readiness level for each entrance to the

courthouse. He assigned the Court Emergency Response Team (CERT) to guard each entrance to the courthouse armed with rifles because it was unknown who or when the threat might transpire. CERT members did not ordinarily carry riles in the courthouse, except where the threat level was believed to be serious. Security staffing was also increased in the hallways. He testified that, in his nine years of working courthouse security, he had not handled a threat to the courthouse of this nature.

¶ 15    Lowery acknowledged on cross-examination that the recorded call made no mention of a bomb or the circuit clerk's office and that the Department worker's description of defendant's call had been wrong. The search revealed no evidence of a bomb.

¶ 16    The State rested. Defendant's case consisted of the following stipulation. On September 12, 2014, two calls were made from 815-xxx-xxxx to the call center. The first was dialed at 11:37 a.m. and its duration was not recorded. The second call was dialed at 11:41 a.m. and was recorded as lasting two minutes and six seconds.

¶ 17    The jury found defendant guilty. He moved for a new trial. The trial court then allowed defendant to proceed *pro se*, and he filed a posttrial motion that added new claims of error. At no point did defendant claim error in regard to Rule 431(b) requirements. The court denied defendant's motion and sentenced him to six years' imprisonment. He timely appealed.

¶ 18                                II. ANALYSIS

¶ 19    Defendant raises one claim of error: that the trial court's admonishments to the prospective jurors did not conform to Rule 431(b), which, as pertinent here, provides:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands *and accepts* the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted

the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) *that if a defendant does not testify it cannot be held against him or her*; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects." (Emphasis added.) Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 20    Defendant notes that the court asked the prospective jurors whether they understood *and accepted* the first three principles but asked only whether they understood the fourth principle, that a defendant's failure to testify must not be held against him or her. Defendant notes that the court was affirmatively obligated to provide all of the enumerated admonishments. See *People v. Schaefer*, 398 Ill. App. 3d 963, 967 (2010). Thus, he reasons, the court erred.

¶ 21    Defendant acknowledges that he failed to preserve this issue for review, as he neither objected at the time nor raised the error in his posttrial motion. See *id.* at 966. However, he invokes the plain-error doctrine, which allows us to consider an unpreserved error that is clear or obvious when (1) the evidence was closely balanced or (2) the error was so serious that it affected the fairness of the trial, regardless of how close the evidence was. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The plain-error doctrine does not operate as a "general savings clause." *People v. Johnson*, 238 Ill. 2d 478, 484 (2010). Rather, the doctrine is construed as a "narrow and limited exception" to the typical rule that unpreserved claims are forfeited. *Id.* For a Rule 431(b) violation to satisfy the second prong, the defendant must produce evidence that the violation produced a biased jury. *People v. Sebby*, 2017 IL 119445, ¶ 52. Defendant does not contend that he can satisfy the second prong but maintains that the evidence was closely balanced such that the first plain-error prong applies. The State concedes that the trial court erred, but disputes that the evidence was not closely balanced. We agree with the State.

¶ 22    The first step in a plain-error analysis is to determine whether clear or obvious error occurred. *Id.* ¶ 49. Rule 431(b) required the trial court to inquire whether the prospective jurors "understood *and accepted*" that, if a defendant does not testify, it cannot be held against him or her. (Emphasis added.) Ill. S. Ct. R. 431(b) (eff. July 1, 2012). The trial court inquired only whether the prospective jurors understood that principle. The court clearly erred.

¶ 23    We turn to the second step in the analysis: whether the evidence of guilt was so closely balanced "that the error alone severely threatened to tip the scales of justice" against the defendant. *Sebby,* 2017 IL 119445, ¶ 51. The defendant bears the burden of persuasion on the question of whether the evidence was close enough to meet this standard. *People v. Choate*, 2018 IL App (5th) 150087, ¶ 52 (citing *People v. Thompson*, 238 Ill. 2d 598, 613 (2010); *Piatkowski*, 225 Ill. 2d at 567)). "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. In so doing, a reviewing court's inquiry "involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.* Considering whether evidence is closely balanced does not involve the sufficiency of close evidence but, rather, the closeness of sufficient evidence. *Id.* ¶ 60.

¶ 24    In determining whether defendant met his burden of demonstrating that the evidence was closely balanced, we note that the material evidence was relatively straightforward and did not turn on credibility determinations. Indeed, the threats at issue, with their accompanying tone, were recorded:

> "I'm coming. I'm fucking killing people. I'm killing the cops that arrested me.
> You guys have no idea what's about to happen. ***. Come and get me. Come and get

me. Come and get me. Come and fucking get me. I'm so – I'm lighting up the Gurnee Police Department and the Waukegan courthouse. Come and get me."

¶ 25 Defendant's friend and former roommate, Bereczky, testified that the threatening voice on the recording was that of defendant and that the phone number from which the call was made was the same number Bereczky regularly used to communicate with defendant. While the dissent suggests that the evidence that defendant made the call was closely balanced, we note that there was absolutely no contrary evidence presented on this issue. Bereczky's testimony in this regard was unimpeached and uncontradicted. Moreover, the actions of Parsano, Lowery, and the people under Lowery's command were not in dispute. Our role as the reviewing court in determining whether defendant met his burden of establishing first-prong plain error is to make a commonsense assessment of whether this evidence was close vis-à-vis the elements of the offense. See *id.* ¶ 53.

¶ 26 Defendant was convicted of making a terrorist threat under section 29D-20(a) of the Act, which provides:

"A person is guilty of making a terrorist threat when, with the intent to intimidate or coerce a significant portion of a civilian population, he or she in any manner knowingly threatens to commit or threatens to cause the commission of a terrorist act as defined in Section 29D-10(1) and thereby causes a reasonable expectation or fear of the imminent commission of a terrorist act as defined in Section 29D-10(l) or of another terrorist act as defined in Section 29D-10(l)." 720 ILCS 5/29D-20(a) (West 2014).

A terrorist act includes "any act that is intended to cause or create a risk and does cause or create a risk of death or great bodily harm to one or more persons." 720 ILCS 5/29D-10(l) (West 2014). Reading section 29D-20(a) and the definition of a terrorist act together, the State was required to prove beyond a reasonable doubt that defendant (1) intended to intimidate or coerce a significant

portion of a civilian population by (2) knowingly threatening to cause death or great bodily harm to one or more persons and that, in doing so, (3) caused a reasonable expectation or fear of the imminent commission of death or great bodily harm to one or more persons. The jury was so instructed.

¶ 27    Our review of the evidence demonstrates that the evidence as to these elements was not closely balanced. Regarding the latter two elements, the threats included "killing people" and "lighting up" the Waukegan courthouse. Lowery testified that "lighting up" is a common expression for shooting. The threats were made on the recorded line of a government agency during the work week at 11:41 a.m. There was testimony that approximately 1000 people came in and out of the courthouse on a daily basis. It is manifest that "killing people" and shooting into crowds, if actualized, would cause or create a risk of death or great bodily harm to one or more persons.

¶ 28    Moreover, the specificity of the threat, the fact that defendant did not deescalate when given the chance, and the statement that "[y]ou guys have no idea what's about to happen," alongside repeated taunts of "[c]ome and get me," provided evidence that the threatened actions were imminent. Indeed, Sergeant Lowery, a nine-year veteran charged with the security of the courthouse, both inside and outside the courthouse, testified regarding the measures taken in response to the threats. Lowery explained that the threat was the most serious he had received in nine years of working courthouse security. He therefore assigned CERT members to guard the courthouse, authorized them to fire their rifles if needed, and increased the staffing in the hallways. Accordingly, the evidence that defendant knowingly threatened to cause death or great bodily harm to one or more persons, and caused a reasonable expectation or fear of the imminent commission of death or great bodily harm to one or more persons, was not closely balanced.

¶ 29     What remains, then, is the question of whether evidence of defendant's intent to intimidate or coerce a significant portion of a civilian population was closely balanced.  The statute does not define what it means to intimidate or coerce a significant portion of a civilian population, though the following definitions are found in Webster's Third New International Dictionary (1993). Intimidate is defined as "to make timid or fearful: inspire or affect with fear surrounding him: FRIGHTEN \*\*\*: *to compel to action or inaction*[.]"  (Emphasis added.)  *Id.* at 1184.  Coerce is defined as "1: to restrain, control or dominate, nullifying individual will or desire \*\*\* 2: *to compel to an act or choice* by force, threat, or other pressure \*\*\* 3: to effect, bring about, establish, or enforce by force, threat, or other pressure[.]" (Emphasis added.) *Id.* at 439.

¶ 30     The State presented evidence that defendant called a government agency during the work week at 11:41 a.m. and threatened: "I'm coming.  I'm fucking killing people."  Defendant then threatened to "light[] up," *i.e.*, shoot up, the Waukegan courthouse.  Even after being told that his call was being recorded, defendant did not recant; he repeated his threat.  His identity and location were unknown. A person is presumed to intend the natural and probable consequences of his acts. *People v. Terrell*, 132 Ill. 2d 178, 204 (1989).  The natural and probable consequences of defendant's threats were that a significant portion of a civilian population—all of the people entering and exiting the courthouse—would be, at a minimum, made fearful by the threat that the courthouse was going to be "lit up."  Based upon a commonsense assessment of the evidence, defendant could not have expected otherwise.  Indeed, while what actually happened is not dispositive of defendant's intent, we reiterate Lowery's testimony that the threat was the most serious he had received in nine years of working courthouse security.  He therefore assigned CERT members to guard the courthouse, authorized them to fire their rifles if needed, and increased the

staffing in the hallways. A significant portion of the civilian population undoubtedly would include the courthouse community and those who use the courthouse.

¶ 31 The gravamen of defendant's argument is that the failure to commit the jury to accept that defendant's non-testimony could not be used against him made it more likely that the jury used his non-testimony to improperly infer his intent to coerce and intimidate. In making this argument, however, defendant devotes little effort to analyzing the evidence or relating it to the specific elements of the charge. Instead, he characterizes his words as "idle threats" that showed him "impulsively venting his ire," and he cites a handful of cases from foreign jurisdictions applying similar statutes to vastly dissimilar factual situations. Given the obvious application of our facts to the elements of the charged offense, we need not look to other jurisdictions' interpretation of similar statutes. Simply put, defendant fails to meet his burden of demonstrating that the evidence was so closely balanced that the Rule 431 error severely threatened to tip the scales of justice.

¶ 32 The dissent correctly observes that "closely balanced" assumes the presence of some evidence from which contrary inferences may be drawn. See *People v. Reeves*, 314 Ill. App. 3d 482, 489 (2000). According to the dissent, in our plain-error review, we should be looking for evidence that would have allowed the jury to draw contrary inferences. See *id.* While we agree that competing versions of events or witness credibility issues can lead to inferences that might warrant a closely balanced finding in a given case, such is not the case here.

¶ 33 The dissent's inference analysis, applied to the facts of the instant case, is problematic. Namely, the dissent posits that defendant's additional threats to kill police officers and "light up" the Gurnee Police Department "are precisely the type of evidence that would allow the jury to draw the contrary inference that the threats were directed at police officers, not a significant portion of a civilian population." But the mere fact that the jury could have drawn a contrary inference

from uncontroverted evidence does not necessarily establish plain error. Indeed, the fact that the recorded call *also* included defendant's threats to police officers and the Gurnee Police Department does not, as the dissent suggests, transform the totality of the evidence into closely balanced evidence. At most, it suggests an inference of additional targets, not the elimination of the targeted courthouse.

¶ 34    Our review of the first-prong, plain-error case law reflects that evidence has typically been found to be closely balanced where, for instance, "each side has presented credible witnesses or where the credible testimony of a witness is countered by evidence that casts doubt on his or her account." *People v. Jackson*, 2019 IL App (1st) 161745, ¶¶ 47-49. No such factual or credibility concerns are present here. Indeed, our review of the case law has not disclosed any instance where uncontroverted evidence introduced by unimpeached witnesses was determined to be closely balanced. In *Reeves* itself, upon which the dissent relies, the court held that the evidence in support of the defendant's murder and aggravated arson convictions was not closely balanced where the defendant had a history of drug transactions with the victims and had threatened them; his car was seen outside the victims' house the evening of the murders; and a lighter fluid container and gas can were found in the defendant's trunk after the murders. 314 Ill. App. 3d at 488-89. The *Reeves* court concluded: "Though the evidence was circumstantial, there was no evidence introduced, direct or circumstantial, from which alternative inferences could be drawn." *Id.* at 489. In this particular case, the evidence did not include competing versions of events.

¶ 35    The determination of "whether the evidence in a criminal trial is closely balanced depends solely on the evidence adduced in that particular case." *People v. Naylor*, 229 Ill. 2d 584, 609 (2008). The evidence here was uncontroverted and did not require credibility determinations. The material evidence included a recording of the threats. The issue was defendant's intent in voicing

those threats in his call to a government agency in the middle of a business day. Intent is inferred from the circumstances and is rarely susceptible of direct proof. See, *e.g.*, *People v. Scott*, 2020 IL App (1st) 180200, ¶¶ 53-56. The recorded call included defendant's threats: "I'm coming. I'm fucking killing people." The recorded call included defendant's threat to "light[] up" the Waukegan courthouse. This evidence—defendant's recorded words—were not controverted.

¶ 36 Simply put, our qualitative, commonsense assessment of the totality of the evidence within the context of this case demonstrates sufficient evidence that was not close. See *Sebby*, 2017 IL 119445, ¶¶ 53, 60.

¶ 37 Finally, we agree with the dissent that defendant could have been charged with lower class offenses such as a class 1 falsely making a terrorist threat (720 ILCS 5/29D-25(a) (West 2014)) or even a class 4 disorderly conduct (720 ILCS 5/26-1(b) (West 2014)). Indeed, as the dissent observes, this case was originally resolved by a plea to disorderly conduct in exchange for probation—a disposition that unraveled when California refused to accept supervision of defendant's probation. Whatever we might think the more appropriate disposition, especially given defendant's lack of felony criminal history and documented history of mental illness, we nevertheless must defer to the charging decisions of the State's Attorney.

¶ 38 Because the evidence of defendant's guilt was not closely balanced, defendant is not entitled to review under the plain-error doctrine. Therefore, the judgment must stand.

¶ 39                                    III. CONCLUSION

¶ 40 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 41 Affirmed.

¶ 42 JUSTICE McLAREN, dissenting:

¶ 43     I disagree with the majority's conclusion that the evidence of guilt was not closely balanced such that the trial court's clear deviation from the requirements of Rule 431(b) was not reversible as plain error. I conclude that the evidence was closely balanced, if not outright insufficient, regarding whether the call constituted a threat of a terrorist act.

¶ 44     In assessing plain error, our job is to determine "whether the evidence adduced at trial *was close*." (Emphasis added.) *Sebby*, 2017 IL 119445, ¶ 53. "[W]e turn to the trial evidence because a requisite to relief under the first prong [of the plain error doctrine] is a finding that that evidence was *closely balanced*." (Emphasis added.) *Id.*, ¶ 52. " 'Closely balanced' assumes the presence of some evidence from which contrary inferences can be drawn." *People v. Reeves*, 314 Ill. App. 3d 482, 489 (2000). "Whether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge." *People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007). The issue "does not involve the sufficiency of close evidence but rather the closeness of sufficient evidence." *Sebby*, 2017 IL 119445, ¶ 60. Closely balanced evidence as to a single issue is sufficient to find that the evidence is closely balanced for a plain error analysis. See *People v. Carbajal*, 2013 IL App (2d) 111018, ¶¶ 41-46 (appellate court "determined that the evidence was closely balanced on the issue of defendant's intent[.]").

¶ 45     I must also point out a factual inaccuracy. *Contra* the majority, the caller did not threaten that he would "kill Gurnee police officers." *Supra* ¶ 4. The caller said, "I'm killing the cops that arrested me." *Supra* ¶ 9. There is nothing in the record regarding any arrest by the Gurnee police department; indeed, there is no evidence of any arrest of defendant preceding the September 12, 2014 phone call. This is not mere quibbling. This entire case is based on a 37-second recording

of 67 words spoken by an unidentified individual. We cannot make up additional words to flesh out a chosen narrative.

¶ 46    I dispute the majority's claim that the evidence "was relatively straightforward and did not turn on credibility determinations." *Supra* ¶ 24. For example, I find it interesting that, while there was a stipulation as to the phone number from which the call was made, the only evidence at trial suggesting that defendant made the call was the testimony of Bereczky, who testified that he told a deputy that the phone number from which the call was made was defendant's and that he believed that the voice on a recording of the call was that of defendant. There were no phone records tying defendant to the number used to make the call. Further, I disagree with the majority's assertion that the closeness of the evidence here was not affected by the issue of witness credibility. See *supra* ¶ 24. Both Parsano and Lowery were questioned about their assessments of the threat presented by the call. Parsano based his assessment of defendant's intent on defendant's failure to recant and the fact that defendant, by hanging up, did not allow him the opportunity to try to deescalate the situation. Lowery even testified regarding his assessment of the viability of the bomb threat that was never made! Their assessments of the threat are opinions, not absolutes.

¶ 47    The majority stresses that "absolutely no contrary evidence" was presented regarding the source of the call and that such testimony was "unimpeached and uncontradicted;" further, that the actions of Parsano and Lowery are "not in dispute." *Supra* ¶ 25. However, we must remember that a defendant has "no burden to present any evidence or to testify himself at trial." *Piatkowki*, 225 Ill. 2d at 567 (finding evidence closely balanced where defendant presented the testimony of only one witness and a stipulation).

¶ 48    Defendant was charged under section 29D-20 of the Act, which provides:

"A person is guilty of making a terrorist threat when, with the intent to intimidate or coerce a significant portion of a civilian population, he or she in any manner knowingly threatens to commit or threatens to cause the commission of a terrorist act as defined in Section 29D-10(1) and thereby causes a reasonable expectation or fear of the imminent commission of a terrorist act as defined in Section 29D-10(l) or of another terrorist act as defined in Section 29D-10(l)." 720 ILCS 5/29D-20(a) (West 2014).

This is a Class X felony. See 720 ILCS 5/29D-20(c) (West 2014).

¶ 49　The majority proposes the elements of the charges as: "(1) with the intent to intimidate or coerce a significant portion of a civilian population (2) defendant knowingly threatened to commit or threatened to cause the commission of a terrorist act and (3) thereby caused a reasonable expectation or fear of the imminent commission of a terrorist act." *Supra* ¶ 26.

¶ 50　First, what evidence was there that defendant intended to intimidate or coerce anyone? While the statute does not define either of those verbs, the majority provides various definitions from Merriam-Webster, including "to compel to action or inaction" (intimidate) and "to compel to an act or choice by force, threat, or other pressure" and "to effect, bring about, establish, or enforce by force, threat, or other pressure (coerce). See *supra* ¶ 29. We can also look to the offense of intimidation, which provides that a person commits intimidation when, "with intent *to cause another to perform or to omit the performance of any act*, he or she communicates to another, directly or indirectly by any means *a threat to perform* without lawful authority" various acts. (Emphases added.) 720 ILCS 5/12-6(a)(1) (West 2014). "The purpose of the intimidation statute is the prohibition of making *threats intended to compel a person to act against his will*." (Emphasis added.) *People v. Casciaro*, 2015 IL App (2d) 131291, ¶ 84.

¶ 51    Common to all these definitions is an element of making someone do something or refrain from doing something.  For example, in *People v. Oduwole*, the defendant was charged with attempt (making a terrorist threat) based in part upon these lines written on the back of a piece of paper: "SEND 2 to***paypal account if this account doesn't reach $50,000 in the next 7 days then a murderous rampage similar to the VT shooting will occur at another prestigious highly populated university.  THIS IS NOT A JOKE!"  *Oduwole*, 2013 IL App (5th) 1200391, ¶ 15.

¶ 52    Unlike the defendant in *Oduwole*, the caller in our case never demanded any action by any person.  The gist of the call here was revenge for actions already taken, not compulsion to do or not do a future act.  "I'm coming.  I'm f***ing killing people.  I'm killing the cops that arrested me."  "I'm lighting up the Gurnee Police Department and the Waukegan courthouse.  Come and get me."  The caller's own words were evidence that could have allowed the jury to draw an inference that the caller did not intend to intimidate or coerce anyone.

¶ 53    The majority posits that the "natural and probable consequences of defendant's threats were that a significant portion of a civilian population—all of the people entering and exiting the courthouse—would be, at a minimum, made fearful by the threat that the courthouse was going to be 'lit up.' "  *Supra* ¶ 30.  These consequences must not have been all that "natural and probable," as they did not, in fact, occur.  There is no evidence that "all of the people entering and exiting the courthouse" were ever told of this threat even though many of those people were evacuated from the courthouse earlier that same day as a response to the nonexistent bomb threat.  The majority states that "what actually happened is not dispositive of defendant's intent" (*id.*), yet it also asserts that defendant must be presumed to have intended what in fact *did not* happen.  *Id.*

¶ 54    Next, who is the "significant portion of a civilian population" that defendant allegedly intended to coerce?  Again, Merriam-Webster has provided a relevant definition: a "civilian" is

"one not on active duty in the armed services *or not on a police or firefighting force*." (Emphasis added.) Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/civilian (last visited Mar. 12, 2021). The only individuals specifically threatened in the call were police officers.[1] While such a threat is, of course, unacceptable, the actual subjects of the threat do not fulfill the statutory requirement of "a significant portion of a civilian population." While civilians could certainly find themselves in the middle of an attack on a police department or a courthouse, the statute requires that a defendant intend to coerce or intimidate a significant portion of a civilian population; the civilians are not to be mere bystanders who could be caught up in the midst of a terrorist act.

¶ 55    The majority completely misapprehends and misanalyses the specific threats to kill police officers that arrested him and to "light up" the Gurnee Police Department. Those threats were specific threats to non-civilians. Yet the majority downplays those specific threats and finds that the call "*also* included" (emphasis in original) those specific targets and "suggests an inference of additional targets, not the elimination of the targeted courthouse."[2] *Supra* ¶ 33. Those specific threats against law enforcement personnel are not mere suggestions of additional targets; they are the focus of the threat. Civilians are never specifically mentioned in the call. The caller did say, "I'm f***ing killing people." However, this generalized reference to "people" (that would also, incidentally, include police officers) is, at best, relevant to, but certainly not conclusive of, a conclusion that a significant portion of a civilian population was the focus of the threat. The actual words of the call-are precisely the type of evidence that would allow the jury to draw the contrary

---

[1] The caller stated, "I'm killing the cops that arrested me." There is no indication as to which arrest or police department the caller was referring.

[2] I also note that police officers would also be present in the courthouse.

inference that the threats were directed at police officers, not a significant portion of a civilian population, thus rendering the evidence closely balanced on this issue, if not actually insufficient.

¶ 56    Ironically, the only time that a large number of civilians was intimidated or coerced was when parts of the courthouse were evacuated; however, this was done in response to the non-existent bomb threat. When Lowery learned of the true nature of the phone call, he did not again evacuate the courthouse, he assigned additional guards to the entrances and hallways of the courthouse and authorized some of them to use rifles. The testimony regarding the evacuation and search of the courthouse was not only irrelevant to the charge, it was extremely prejudicial, showing fear and frantic activity based on a threat that defendant did not make. In looking at the balance of evidence, the State's use of irrelevant, prejudicial evidence makes the balance much closer.

¶ 57    The majority then lists nebulous and irrelevant evidence to support its conclusion that the evidence regarding the element of "a reasonable expectation or fear of the imminent commission of a terrorist act" was not close. See *supra* ¶ 28. I agree that the statement "[y]ou guys have no idea what's about to happen," is relevant to this consideration. However, how does the failure to recant influence this? How is the taunt of "Come and get me" evidence that the threatened actions were imminent? How are Lowery's actions taken *after* receipt of the threat evidence of a reasonable expectation or fear of the imminent commission of a terrorist act? A fear of an imminent terrorist attack may be adjudged to be reasonable or unreasonable based on the alleged threat. Lowery's actions may be adjudged reasonable or unreasonable, in light of the reasonableness or unreasonableness of his fear of a terrorist attack. But Lowery's later-taken actions is not evidence of the reasonableness of his fear of an imminent terrorist attack. Actions

follow a conclusion; they may be evidence of the conclusion, but they cannot support the conclusion that preceded them.

¶ 58    Section 29D-20(b) of the Act provides in part that "[i]t is not a defense to a prosecution under this Section [making a terrorist threat] that at the time the defendant made the terrorist threat, unknown to the defendant, it was impossible to carry out the threat."  720 ILCS 5/29D-20(b)n (West 2014).  Applying the principle of *inclusio unius est exclusion alterius* (the inclusion of one thing in a statute is construed as the exclusion of all others) (see *People v. Knapp*, 2019 IL App (2d) 160162, ¶ 121 (McLaren, J., dissenting)), the legislature has thus allowed as a defense to a charge of making a terrorist threat the defendant's knowledge that it was impossible to carry out the threat.  Such knowledge of impossibility would, in fact, make the threat a *false* threat.  Here, it is undisputed that defendant was in southern California at the time that the threatening call was made.  While not conclusive proof of impossibility, that fact is certainly evidence reducing the probability that defendant could fulfill such a threat, again making the evidence more closely balanced under a plain error review.

¶ 59    Further, what Lowery did after learning of the threat cannot prove whether the caller actually did what the statute proscribed.  We are supposed to be reviewing the evidence as to what *defendant* did, not as to what was done in response, especially as it relates to the threat being true or false.  The evidence as to whether the threat was true or false is close simply because the opinions of law enforcement officials will virtually always make it "true" if they react as responsible guardians of the public safety.

¶ 60    Interestingly, the legislature has provided two statutory schemes under which a person may be prosecuted for making a false threat.  First, section 29D-25 of the Act (Falsely making a terrorist threat) provides in relevant part:

"(a) A person commits the offense of falsely making a terrorist threat when in any manner he or she knowingly makes a threat to commit or cause to be committed a terrorist act as defined in Section 29D-10(1) or otherwise knowingly creates the impression or belief that a terrorist act is about to be or has been committed***that he or she knows is false." 720 ILCS 5/29D-25(a) (West 2014).

This is a Class 1 felony, versus the Class X felony that was charged. See 720 ILCS 5/29D-25(b) (West 2014).

¶ 61    We review all the provisions of an enactment as a whole so that words and phrases are not construed in isolation but are interpreted in light of other relevant statutory provisions. *People v. Molnar*, 222 Ill. 2d 495, 519 (2006). "All parts, provisions or sections of a statute must be construed together, in light of the general purpose and object of the statute, so as to make it harmonious and consistent in all its parts." *People v. Burchell*, 2018 IL App (5th) 170079, ¶ 8.

¶ 62    The legislature is fully within its power to punish different offenses differently. *People v. Townsend*, 275 Ill. App. 3d 413, 419 (1995). In general, where the legislature affixes a greater penalty to an offense, it deems that offense more serious than other offenses with lesser penalties. See *People v. James*, 246 Ill. App. 3d 939, 946 (1993). The legislature has clearly differentiated between making a terrorist threat and falsely making a terrorist threat. It has also clearly determined that making a terrorist threat (Class X felony) is a more serious offense than falsely making a terrorist threat (Class 1 felony); the greater penalty speaks to that. But what is the difference between the two acts? The majority declines to consider this distinction, let alone address it.

¶ 63    I first note that the charge of falsely making a terrorist threat does not require the intent to intimidate or coerce a significant portion of a civilian population. Next, it does require that the

defendant know that the threat that he has made is false.  See 720 ILCS 5/29D-25(a) (West 2014).

Considering this in context with section 29D-20 of the Act, making a terrorist threat must then require the maker's knowledge that the threat is *not* false.  Again, the call in question did not attempt to intimidate or coerce a significant portion of a civilian population.  Further, defendant's residence in southern California on the day of the call certainly was evidence that imminent commission of the threatened activity was improbable, if the threat was not an outright falsehood.

¶ 64    Second, the legislature has provided the crime of disorderly conduct that is chargeable, in relevant part, when a person knowingly:

> "[t]ransmits or causes to be transmitted in any manner to any peace officer, public officer or public employee a report to the effect that an offense will be committed, is being committed, or has been committed, knowing at the time of the transmission that there is no reasonable ground for believing that the offense will be committed, is being committed, or has been committed."  720 ILCS 5/26-1(a)(4) (West 2014).

This charge is a Class 4 felony.  See 720 ILCS 5/26-1(b) (West 2014).

¶ 65    At one point in this case, defendant did plead guilty to a reduced charge of disorderly conduct in that he "transmitted to a public employee a report that an offense will be committed knowing at the time of the transmission that there was [*sic*] no reasonable grounds for believing that the offense would be committed."  Defendant was sentenced to an 18-month term of probation and time served in jail, with his probation to be transferred to California.  The trial court granted defendant's motion to withdraw his guilty plea after the State of California declined to accept the transfer of probation.

¶ 66    I address these other charges because they are relevant to a plain error analysis, not merely to challenge the charging prerogative of the State's Attorney.  See *supra* ¶ 31.  The legislature has

addressed a defendant's knowledge of the impossibility of completing a threat under this charge and also provided two specific charges addressing false threats. The "truth" of the threat under the charge brought here is a relevant consideration. The question is not whether the threatened action did or did not occur, but whether the reported threat was true or false.

¶ 67    Considering all the evidence in this case, including what actually was (and was not) said on the call and defendant's location on the day in question, I conclude that the evidence that defendant committed the crime of making a terrorist threat was, at most, closely balanced. This evidence actually leaned more heavily towards the uncharged crimes of falsely making a terrorist threat or disorderly conduct. The trial court's clear and obvious failure to properly admonish the jurors pursuant to Supreme Court Rule 431(b) should be considered plain error, and defendant should receive a new trial. Therefore, I dissent.